HONORABLE RICARDO M. URBINA, UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**
JUN 1 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA : Docket No.: CR-07-034-01

vs.

OTENG-AGIPONG, Yaw : Disclosure Date: April 17, 2007

## RECEIPT AND ACKNOWLEDGMENT OF PRESENTENCE INVESTIGATION REPORT

This is to acknowledge that each of the undersigned has received and reviewed the Presentence Investigation Report (PSR) in the above-entitled case. The undersigned further acknowledges that:

### For the Government
(CHECK APPROPRIATE BOX)
( ) There are no material/factual inaccuracies therein.
( ) There are material/factual inaccuracies in the PSI report as set forth in the attachment herein.

_____     _____
Prosecuting Attorney                                   Date

### For the Defendant
(CHECK APPROPRIATE BOX)
( ) There are no material/factual inaccuracies therein.
(X) There are material/factual inaccuracies in the PSI report as set forth in the attachment.

_Yaw Oteng-Agipong_ 5-1-07     _Brigitte L. Adams_ 5-1-07
Defendant              Date         Defense Counsel        Date
                                    Brigitte L. Adams

## NOTICE OF OBLIGATION OF THOSE EXECUTING THIS FORM

Pursuant to Local Rule 32(f)(2), those executing this form shall first submit any material inaccuracies or disputes in writing by **May 1, 2007**, to U.S. Probation Officer **Deborah A. Stevens-Panzer**, telephone number (202) 565-1422, fax number (202) 273-0242.

Pursuant to Rule 32(b)(6)(B), effective December 1, 1994, it shall be the responsibility of the Attorney for the Government and the Defense Counsel to provide each other with a copy of the objections at the same time the objections are filed with the probation office.

FOR THE COURT

By: Gennine A. Hagar, Chief
United States Probation Officer

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>PLAINTIFF )<br>)<br>vs. )<br>)<br>YAW OTENG-AGIPONG )<br>DEFENDANT )<br>_____) | Docket No. CR-07-034-0 |

### DEFENDANT'S CORRECTION OF INACCURACIES IN PRESENTENCE INVESTIGATION REPORT

Defendant Yaw Oteng-Agipong ("Mr. Agipong"), by and through his undersigned counsel, hereby submits this correction and explanation of inaccuracies in the Presentence Investigation Report, as prepared April 16, 2007 ("PSI Report").

#### PART A. THE OFFENSE

The facts set forth in paragraph 6 of the PSI Report do not capture the full story of what occurred to create the offense in this case. As long as material additional details are omitted, the reader will not know the whole story of what occurred here and will be mislead in their understanding of the truth. It is important to recognize that the government's facts derive solely from Mr. Agipong. Only Mr. Agipong and the DCRA employee were party to the encounters, discussions, agreements which comprised the offense. The DCRA employee was not interviewed for the PSI Report. Consequently, Mr. Agipong is the sole source of these facts, and is in the best position to ensure their accuracy.

The statements in paragraph 6 are not entirely false; they are simply incomplete and open for misleading interpretation. To correct this situation, Mr. Agipong offers the following sentence-by-sentence explanation and expansion of paragraph 6, beginning with the second sentence.

| Language of Paragraph 6 | Misleading Interpretation | Explanation/Expansion |
|---|---|---|
| "The defendant asked [] the DCRA employee to approve the building plans so the construction could continue." | It would be misleading to interpret this statement to read that defendant's plan was to circumvent zoning and building regulations so that the LLC could continue construction contrary to the usual DCRA requirements. | While the ultimate goal was for DCRA approval of the building plans which would allow construction to continue, it was never contemplated that DCRA would approve plans that were not in compliance with regulations or requirements. Defendant was redrawing and revising the plans to meet normal standards. |
| "He also informed the employee he would give him $2,000 if he approved the plans...." | It would be incorrect to think that defendant sought approval of the existing, unlawful building plans in exchange for the bribe money. | Defendant informed the DCRA employee that he would give him $2,000 if he would expedite processing of newly drafted plans which were in compliance with DCRA requirements. By expediting the process, defendant would limit the construction downtime for his LLC client. |
| "The DCRA employee agreed to take the money in return for lifting the stop work order." | While lifting the stop work order was the ultimate objective, defendant never agreed to pay a bribe in direct exchange for lifting the stop work order. Such an interpretation would be false. | Defendant understood that he would have to prepare and present revised building plans that met all zoning and building requirements. The bribe was paid to expedite the approval process once the new plans were presented. Accordingly, as stated in paragraph 7 of the PSI Report, defendant asked the |

| | | |
|---|---|---|
| | | LLC to pay him $20,000 in total, which included payment for his drafting services and for normal DCRA fees. |
| "The employee also agreed to lower the fine levied against the LLC property from $6,000 to $3,000." | It would be incorrect to attribute the reduced fine in any way to the bribe offer. | The DCRA employee agreed to reduce the fine from $6,000 to $3,000 after defendant convinced him that the fine was calculated improperly. Consequently, the reduction was entirely lawful and appropriate. The DCRA employee would have reduced the fine to $3,000 regardless of the bribe. Such reductions in fines are commonplace. |

At the March 8, 2007 plea hearing in this case, Mr. Agipong provided each of the foregoing clarifications verbally to the Court prior to entering his plea of guilty, to which the government did not object. A copy of the transcript of Mr. Agipong's elaboration of these facts, and the government's non-objection to the same, is attached hereto.

Based on the foregoing, Mr. Agipong requests a revision of paragraph 6 to reflect the true nature and scope of the bribe offense to which Mr. Agipong plead guilty. Mr. Agipong contends that the clarifications he has identified are material to his case and important for an accurate understanding and appreciation of the circumstances of his offense.

PART C. OFFENDER CHARACTERISTICS

Mr. Agipong has identified two errors in the discussion of his personal background and characteristics.

-3-

In paragraph 31, the name of the school of his son in the eighth grade should be changed from *St. Aloysius School* to *St. Anselm's Abbey*.

In paragraph 33, the last sentence should instead read, "The group raises money *to help hospitals in Ghana*."

### PART D. SENTENCING OPTIONS

Mr. Agipong believes that the discussion of sentencing options in the PSI Report could be presented more clearly so as not to mislead the Court to understand that it must impose a term of custody in this case.

Part D of the PSI Report begins with a statement of custody. However, in setting forth the terms of U.S.S.G. §5C1.1(c), the Report lists only two of the three options given for "Imposition of a Term of Imprisonment." In U.S.S.G. §5C1.1(c), the three options for imprisonment include a sentence of (1) straight imprisonment, (2) imprisonment with conditional supervised release, or (3) probation with conditional imprisonment. The PSI Report omits the third option altogether in its discussion of the forms of custody available to the Court.

In a telephone discussion with the Probation Office, it was explained that the third sentencing option listed in U.S.S.G. §5C1.1(c)(3), for probation with imprisonment, is identified three sections and six paragraphs away from the listing of the other two imprisonment options in the PSI Report. In Mr. Agipong's view, the separation of the first two options from the third one is unwarranted, confusing and misleading. Therefore, Mr. Agipong asks that all of the options for imprisonment be listed together.

Alternatively, the listing of the three options should be listed individually under each appropriate heading. In this manner, option (1) for incarceration only would

be addressed under the heading for custody. Option (2) for imprisonment with conditional supervised release would be addressed under the heading for supervised release. And, option (3) for probation with imprisonment would be addressed under the heading for probation. At least in this way, each of the options would be given equal weight and attention.

Similarly for the sake of clarity, the heading in the PSI Report, Impact of Plea Agreement, at paragraph 53 is misplaced and breaks the sequence and flow of the listing of options. Since the impact of the plea agreement applies to all three sentencing options listed in U.S.S.G. §5C1.1(c), it is better placed at the end of Part D following the discussion of the sentencing options. As it is now written, the placement of the plea impact statement leads the reader to believe that the preceding options are the complete universe of options to which the Plea Agreement applies. In fact, as it is now written, the plea agreement impact statement interrupts the sentencing options unnecessarily and appears to omit the probation option altogether.

Accordingly, Mr. Agipong requests in the first instance that all three imprisonment options be listed together in the same paragraph, just as they are listed in the sentencing guidelines. Alternatively, he requests that each option be addressed under its own heading *and* the statement concerning the impact of the plea agreement be moved to a paragraph following the discussion of each sentencing option.

Mr. Agipong takes exception with the discussion in paragraph 56 concerning a term of imprisonment greater than one year. The basic sentencing guideline in this case is for a term of imprisonment of six- to 12-months. Because the PSI Report presents no particular mitigating or aggravating circumstances, it is unnecessary and

misleading to discuss sentencing options greater than the guideline range. Therefore, Mr. Agipong requests removal of the sentence which includes the clause, "if the Court imposes a term of imprisonment of more than one year ...."

Finally under the section entitled Probation, Mr. Agipong asks for a more complete discussion of the schedule of substitute punishments, which are set forth in U.S.S.G. §5C1.1(e) and as referenced in §5C1.1(c)(3). We believe it would be instructive to the Court to understand the scope of its options for sentencing Mr. Agipong to a term of home detention in this case. As it is currently written, the PSI Report does not provide that form of guidance to the Court, which we feel is warranted.

PART E. FACTORS THAT MAY WARRANT DEPARTURE

Discussions with the FBI and DOJ are ongoing with regard to Mr. Agipong providing substantial assistance in the investigation of other offenses of a similar or related nature. Therefore, while it is understood that the Probation Office currently has no information that would suggest a departure from the sentencing guidelines, it should be reflected in the PSI Report that these discussions are ongoing and that justification for a departure may be forthcoming.

Wherefore, Mr. Agipong requests that the Probation Office incorporate the foregoing adjustments in its PSI Report. The excerpt of the plea hearing transcript identified above is attached hereto. A full copy of the transcript is on file with the Court.

May 1, 2007                                Respectfully submitted,

                                           *Brigitte L. Adams* (signature)
                                           Brigitte L. Adams, Esq. (Bar #426034)
                                           2800 Wisconsin Ave., N.W. #208
                                           Washington, D.C. 20007
                                           (202) 363-8190

```
                    UNITED STATES DISTRICT COURT
                        DISTRICT OF COLUMBIA
UNITED STATES OF AMERICA           CRIMINAL ACTION NO. 07-0034
                                   WASHINGTON, DC
                                   THURSDAY, MARCH 8, 2007
VERSUS


YAW OTENG-AGIPONG                  10:15 A.M.


                            PLEA HEARING

            BEFORE THE HONORABLE RICARDO M. URBINA
                 UNITED STATES DISTRICT COURT JUDGE


A P P E A R A N C E S:

FOR THE PLAINTIFF,                 MR. DANIEL BUTLER, ESQ.
UNITED STATES OF AMERICA           U.S. ATTORNEY'S OFFICE
                                   555 Fourth Street, NW
                                   Washington, DC  20001


FOR THE DEFENDANT,                 MS. BRIGITTE ADAMS, ESQ.
YAW OTENG-AGIPONG                  2800 Wisconsin Avenue, NW
                                   Washington, DC  20007
                                   (202) 363-8190


REPORTED BY:                       WENDY C. RICARD, CCR, RPR
                                   OFFICIAL COURT REPORTER
                                   333 Constitution Avenue
                                   Room 6816
                                   Washington, DC 20001
                                   (202) 354-3111

Proceedings recorded by mechanical stenography.

Transcript produced by computer-aided transcription.
```

```
 1           MS. ADAMS: Your Honor, it's just an elaboration.
 2   They are essentially true. They are true from a broad
 3   perspective, but there's just a point of clarification -- two
 4   points of clarification that I would like to make, which I
 5   have discussed with Mr. Agipong in advance.
 6           With regard to the essence of -- the purpose of the
 7   $2,000-payment to the DCRA employee, it was not to -- it was
 8   ultimately to have the stop work order lifted, but the
 9   specific purpose of it was to expedite the processing of
10   redrafted diagrams and plats and the application form, which
11   would have conformed to the regulations with regard to zoning
12   and building requirements.
13           THE DEPUTY CLERK: Excuse me. All cell phones
14   should be turned off. I'm sorry.
15           MS. ADAMS: Thank you. So the --
16           THE COURT: You're saying that the $2,000 was for
17   the purpose of expediting the processing of --
18           THE DEFENDANT: Building permits.
19           THE COURT: Drawings and other papers in order to
20   qualify the project; is that right?
21           MS. ADAMS: In order to qualify the project which
22   would have made it within the regulations. Mr. Agipong was
23   approached by these clients with the stop work order. That's
24   when he first got involved with the project, and they came to
25   him under this crisis situation because their project had been
```

12

1  stopped due to the stop work order. And it was Mr. Agipong's
2  task to correct the drawings, redraft the application, and get
3  a proper building permit which was the plan all along and
4  which was the plan Mr. Agipong was carrying out.
5      The $2,000 came into play when Mr. Agipong
6  approached the DCRA employee to get the processing of that
7  redrafted application expedited so that -- and I'm just
8  throwing out this here -- which something that would have
9  taken eight weeks could have been done -- would have been done
10 within a week or a few days because of the payment of the
11 $2,000.
12     We are not saying that that was a correct thing to
13 do. We are standing here before the Court accepting
14 responsibility and acknowledging our wrongdoing in that. And
15 -- but it is merely a clarification that we were not willing
16 to pay the $2,000 to circumvent the law in terms building a --
17 putting up a construction that would have been in violation of
18 the regulations, but merely to expedite the processing of a
19 redrafted application. And, furthermore, with regard to the
20 second statement of the permit, the price of the stop work
21 order -- that there is a fee that's levied because of the stop
22 work order, it indicates in here that there was a reduction of
23 that stop work order fee, and the reduction of that fee, yes,
24 would have occurred at the end of this process, but that would
25 have occurred legally and legitimately, albeit, on a more

expedited basis, but there was a legitimate basis for having that fee reduced.

And Mr. Agipong has explained to me that there was a series of errors and misunderstanding in terms of the stop work order fee. For instance, not all of the inspections would have to be redone, and it involved one property and not two. And so there was a legitimate reason for reducing that fee, but the essence of the payment of the $2,000 was for the expedited treatment.

THE COURT: All right. Mr. Butler, do you have any problem with the clarification that's just been provided?

MR. BUTLER: Your Honor, I think it still shows that there is a quid pro quo. What makes this illegal is the receipt of a public official of money in return for an official act, and if that was to expedite the process which then caused the stop work order to be lifted, the fine to be reduced, the public official was still offered a quid pro quo, money, that he was not entitled to in return for doing an official act. And so, yes, the elements would still be made out, Your Honor.

THE COURT: All right. This variance in how -- well, is the government going to dispute this interpretation of what Mr. Agipong did when it comes time of sentencing?

MR. BUTLER: Your Honor, the government stands on the statement of offense as stated and signed by the defendant

```
 1  in this case.  We will accept, for purposes of the plea here
 2  today, the fact that the -- even under the addition made by
 3  defense counsel to it, it still makes out the offense, but the
 4  government stands by what is stated in the statement of
 5  offense.
 6          THE COURT:  All right.  Well, I just want to make
 7  sure that everyone is clear.  I agree that what Mr. Agipong
 8  has admitted to with the added clarifications through counsel
 9  constitutes the offense of promising a bribe.  Because if it
10  was either to get a public official to overlook certain
11  matters and to permit something to go forward, to permit these
12  plans to go forward in an authorized way when they were
13  deficient, or whether it was to get a public official to
14  expedite treatment and consideration and approval of plans, it
15  all adds up to paying money to do something that's illegal.
16          However, I don't know precisely how the difference
17  in opinion may affect the elocution at the time of sentencing,
18  how it may affect what one version versus another version or
19  how it may affect the application of the guidelines when you
20  look at one version versus the other version because we're
21  talking about what state of mind Mr. Agipong was in when he
22  delivered the money or when he tried to bribe the official.  I
23  just want to raise it, maybe it makes no difference at all,
24  but it may have an impact, and I just want to make sure
25  everyone is aware of that.
```

```
 1        MR. BUTLER:  Just to add to that, Your Honor, the
 2   government does not see the addition as a breach of the plea
 3   agreement  The government is bound by the plea agreement as
 4   written.  There was no change in that whatsoever.
 5        THE COURT:  Okay.  Mr. Agipong, so with those
 6   clarifications and additions, you are admitting to the offense
 7   that's being charged; is that correct?
 8        THE DEFENDANT:  Yes, sir, Your Honor.
 9        THE COURT: Has anybody said or done anything to you
10   that causes you to believe that you don't have a choice in
11   this  matter, but that you have to plead guilty?  I'll repeat
12   it. Has anybody said or done anything to you that makes you
13   think that you don't have a choice, you have to plead guilty,
14   you can't go to trial, you have to plead guilty?  Has anybody
15   said anything to you like that?
16        THE DEFENDANT:  No, Your Honor.
17        THE COURT:  Are you under the influence of any drug,
18   alcohol, medication, fear, anything at all, which at this time
19   would prevent you from being able to think clearly and make an
20   intelligent decision about what to do?
21        THE DEFENDANT:  Nothing, Your Honor.
22        THE COURT: Are you satisfied with the services of
23   your attorney, the way counsel has handled your case, given
24   you advice, and assisted you in reaching this very important
25   decision about what to do?
```

```
 1        THE COURT: Yes.  There is an order I've just signed,
 2   and it will set forth the schedule for the filing of
 3   submissions connected to the sentencing process.
 4        MS. ADAMS: Thank you very much.  Thank you.
 5        THE COURT: You're welcome.
 6             [END OF PROCEEDINGS]
 7                  C E R T I F I C A T E
 8
 9        I, Wendy C. Ricard, Official United States Court
10   Reporter in and for the District of Columbia, do hereby
11   certify that the foregoing proceedings were taken down by
12   me in shorthand at the time and place aforesaid,
13   transcribed under my personal direction and supervision,
14   and that the preceding pages represent a true and correct
15   transcription, to the best of my ability and
16   understanding.
17
18
19
20                         _____
21                         Wendy C. Ricard, CCR, RPR
22                         Official U.S. Court Reporter
23
24
25
```